Argued April 14; reversed July 8, 1931.

# FIDELITY SECURITY CORPORATION *v.*
# BRUGMAN ET AL.

(1 P. (2d) 131)

40 ·

*F. P. Keenan,* of Portland (Reynolds, Flegel & Smith, of Portland, on the brief), for appellants.

*John H. Hall,* of Portland (D. P. Price, of Portland, on the brief), for respondent.

ROSSMAN, J. Preliminary to a consideration of the assignments of error, we deem it well to state the following few undisputed facts. The execution of the $2,310 note which constitutes the subject-matter of this action had its inception in the following transaction: In September, 1926, the defendants, who are engaged in the real estate and timber business, were apprised by one Ben F. Walling, a real estate broker, that a parcel of real property known as the Juliana Apartments in Portland could be purchased for the sum of $52,500 payable $15,000 in cash and the balance

in deferred payments secured by a first mortgage upon the said property. Defendants became convinced that at the price of $52,500 the Juliana Apartments constituted an attractive purchase but lacked the required $15,000 cash. Walling, being acquainted with one C. W. Pallett, manager and treasurer of the plaintiff, suggested that he possibly could procure the required cash through Mr. Pallett. The testimony of the various witnesses which relates the incidents that followed this interview is for the most part in conflict.

According to Brugman, a conference took place between himself, Pallett, and Walling which resulted in an agreement that the defendants should execute their negotiable note in the sum of $20,000, payable three years hence, with 7 per cent interest, to Ben F. Walling or order, secured by a second mortgage upon the Juliana Apartments, and that Walling should at once assign the note and mortgage to the plaintiff which would thereupon pay to the defendants $16,000. Brugman testified that Pallett did not explain the reason for making the note payable to Walling, but that he knew the plaintiff would seek thereby to avoid the consequences of the laws against usury. Brugman further testified that shortly after this conference the plaintiff, over the signature of Pallett, submitted a memorandum of its offer wherein, in addition to the above terms, it included a requirement that the defendants purchase from the plaintiff a house and lot in a subdivision of Portland, entitled Westmoreland, for the sum of $2,310, subject, however, to two mortgages aggregating $3,300, provided the plaintiff would find a lender willing to loan the defendants $2,310 upon their note, due seven months hence, bearing 8 per cent interest, secured by a third mortgage upon the West-

moreland property and to be further secured by a bill of sale upon some personal property owned by the defendants. Brugman testified that he protested against being required to purchase the house and lot but that the plaintiff refused to recede from its demands. According to his testimony, he was satisfied that this property was worth less than the two mortgages of $3,300 which encumbered it, but believing that he could escape liability upon this note by pleading that it was a purchase money obligation, and being very desirous of proceeding with the purchase of the Juliana Apartments, agreed to the plaintiff's terms. He produced testimony that the transaction was consummated in the following manner: Pallett's son, C. W. Pallett, Jr., the payee named in the $2,310 note, gave to Brugman a check for $2,310. At that time the son's bank account contained a credit of only $50. Brugman at once endorsed this $2,310 check and handed it to Pallett, Sr., who later delivered to the defendants a deed to the Westmoreland property. The day following the delivery of the above-mentioned check, Pallett, Sr., deposited to his son's credit at the bank $2,400; about two months later the plaintiff paid to Pallett, Jr., $2,310, and thereupon the latter made the necessary endorsement of the note and an assignment of the mortgage so as to evidence the plaintiff's title. This is the note which constitutes the subject-matter of this action. Other evidence introduced by the defendants indicated that the Westmoreland property was worth slightly more than the two mortgages which encumbered it. Brugman testified that he had no desire whatever to purchase the Westmoreland property, and that while the plaintiff did not explain to him the reason for including it in the transaction concerning the $20,000 note he knew that Pallett's

purpose was thus to obtain an additional $2,310 profit out of the transaction covering the $20,000 note. We shall state Pallett's version later.

The exchange of the $20,000 note, together with the accompanying mortgage and incidental papers, for the $16,000 in cash was consummated through the instrumentality of an escrow agent. The latter received three letters of instruction. The one over the signature of the plaintiff enclosed its check in the sum of $16,000, payable to Walling, to be delivered to him upon the escrow agent's receipt of the defendants' note, endorsed by Walling, in the sum of $20,000, secured by a second mortgage upon the Juliana Apartments. Walling's letter instructed the escrow agent to deliver defendants' note and mortgage, which he enclosed with his letter, to the plaintiff upon the latter's deposit of the sum of $16,000. The third letter of instruction, being the one over the signatures of the defendants, transmitted their note and mortgage for the sum of $20,000, payable to Walling, with directions "to use in connection with your above-numbered escrow upon payment to my account of $15,500 * * *." (The balance of $500 constituted Walling's commission).

According to Mr. Pallett, the plaintiff was not engaged in making real estate loans, and confined its business to that of "buying paper." He testified that he had no conferences or negotiations whatever with the defendants, and explained that he became interested in the $20,000 note when Walling informed him that "he was dealing or propositioning the Juliana Apartments" in such a manner that he (Walling) would obtain a $20,000 note, secured by a second mortgage upon that property, under such favorable circumstances that he could afford to discount it. Pallett

swore that he thereupon appraised the aforementioned property and offered Walling $16,000 for the contemplated note and mortgage. Pallett testified that when these terms seemed satisfactory he suggested that, since he was helping Walling in a matter of consequence to the latter, he would like to have Walling help him dispose of the Westmoreland property, and thus brought that property into the transaction. He testified that, not being a real estate salesman, he was experiencing difficulty in finding a buyer for this property which had recently come into the possession of the plaintiff. He added that at this point Walling requested a writing setting forth fully the terms of plaintiff's offer, and that when he prepared the writing he included a requirement that the makers of the $20,000 note must purchase the Westmoreland property at the price of $2,310. Pallett insisted that the Westmoreland property was worth at least $2,310 in excess of its encumbrances. He explained that the money paid by his son for the $2,310 note and mortgage belonged to the son, and that the plaintiff purchased this note and mortgage from him when the son was in need of money.

The $20,000 note was paid before its maturity by an individual to whom the defendants sold the Juliana Apartments. In August of 1927, the holder of the second mortgage upon the Westmoreland property instituted suit to foreclose it, naming as parties defendant, among others, these defendants. After all the defendants had defaulted and the appropriate proceedings had been taken, the mortgagee acquired title. The action with which we are now concerned is, therefore, an action upon the note alone. The nature of the assignments of error render it unnecessary for us to narrate any more of the evidence.

The first two assignments of error challenge rulings made by the circuit court wherein it received, over the objections of the defendants, evidence which apparently was intended to show (1) that Pallett believed in good faith that the Westmoreland property was worth $5,600 at the time of the execution of the two aforementioned notes, and (2) that the property was, in fact, worth that sum of money. Thus the court permitted Pallett, as a witness for the plaintiff, to testify, over the objections of the defendants, that when the plaintiff acquired this property, approximately a year prior to its transaction with the defendants, he (Pallett) considered it worth over $5,500, and that "I had it appraised by Mr. Camp and myself and it was sold at that price, $5,600." Unless the answer just quoted states the value placed upon the property by Camp, no other answer made by Pallett or anyone else does so. After having described the house, he was asked, "Did you believe that the house and the property was worth the $2,310?" to which he replied, "Yes, I never doubted but what I would get my money out of it, and I never doubted but what he was taking the property in good faith." Further evidence, received over the objections of the defendants, consisted of a contract, dated September 1, 1924, wherein one L. R. Watts agreed to purchase this property from another, P. W. Lauman, at the price of $2,300, subject to a first mortgage of $3,000 and a second mortgage of $675. The price was payable, $710 cash, and the balance in monthly installments of $21, together with additional installments of $250 annually. This contract was later assigned by Lauman to the plaintiff, and upon Watts' subsequent default the plaintiff somehow acquired title.

The defendants, in partial support of their contention that the $2,310 note did not represent the purchase

price of the property but was additional interest money exacted by the plaintiff, had supplied testimony indicating that the property's value scarcely exceeded its encumbrances. They argue that the price fixed in the Lauman-Watts contract was an immaterial fact, that their objections, "incompetent, irrelevant and immaterial," urged against the questions put to Pallett should have been sustained, and that the evidence does not show that Pallett was possessed of sufficient qualifications to render his opinion as to the value of the Westmoreland property admissible.

 Whether a witness is possessed of such adequate knowledge of, or special qualifications upon, the subject matter of the inquiry as will tend to give value to his opinions and thereby render them admissible in evidence is a matter which rests largely in the discretion of the trial court: *State v. Jennings,* 131 Or. 455 (282 P. 560). Pallett had testified that he had resided in Portland since 1882, that since 1890 he had dealt in commercial paper consisting in part of real estate mortgages, and that from time to time, "I was handling loans, I made loans and sold them sometimes." He also related his familiarity with this property through an examination of it by himself and Camp. The above being the nature of his qualifications, the record disclosed no abuse of the discretion vested in the circuit court in the receipt of his opinion-evidence.

 But there is still another reason for holding that Pallett was entitled to express himself as he did. It will be observed that the defendants contended that the transaction in regard to the Westmoreland property was not a real purchase by the defendants and a sale by the plaintiff, but that the execution of the deed and mortgage were fraudulent devices to which Pallett

resorted for the purpose of cheating the laws against usury by making a note given for usurious interests appear as a purchase money note. One of the requisite elements of a usurious contract is a corrupt intent to take more than the legal rate of interest for the sum loaned: *Balfour v. Davis,* 14 Or. 47 (12 P. 89); Webb on Usury, § 33. The question of intent at times is nothing more than a question of law, and a corrupt intent to take usurious interest would at once be evident in this case as a matter of law if it was admitted that the $2,310 note was without any consideration whatever except as additional interest upon the $20,000 note. But if the contrary appeared and the Westmoreland property was shown to be worth the sum expressed in the $2,310 note, and if it became evident that Pallett honestly believed at the time of the challenged transaction that the property was worth $5,600, these circumstances would be at variance with the alleged scheme upon which the defendants' case depended; in other words, Pallett would not employ, for the purposes alleged by the defendants, property which he believed was worth as much as the defendants' $2,310 note. The defendants, of course, contend that Pallett's motive was to obtain usurious interest, and, hence, offered testimony that the Westmoreland property was valueless. But if this property was worth $5,600, the motive or reason assigned by the defendants for this transaction was negatived, and a different motive was made to appear; that is, a purpose of disposing of the property in a bona fide sale. We are, therefore, of the opinion that the contentions of the defendants rendered it permissible for the plaintiff to introduce the proof concerning Pallett's belief as to the value of the Westmoreland property: 22 C. J. Evidence, p. 175, § 114, and Wigmore on Evidence (2d Ed.), § 118.

■ The defendants also contend that the court erred when it permitted the plaintiff to offer proof that Lauman sold this property to Watts for $5,975. When the sale of property is so recent in time that conditions then affecting value are substantially the same as those present at the time of the challenged transaction, the price obtained for the property in the sale may be disclosed for the purpose of establishing the property's present value: *Oregon R. & N. Co. v. Eastlack*, 54 Or. 196 (102 P. 1011, 20 Ann. Cas. 692) ; 22 C. J ., p. 181, § 129. But when the sale was made at a remote time or when conditions affecting value have materially changed, evidence of the sale price is inadmissible: *Portland v. Tigard*, 64 Or. 404 (129 P. 755, 130 P. 982) ; *Oregon R. & N. Co. v. Eastlack,* supra, and 22 C. J. Evidence, p. 181, § 129. It will be recalled that the only objection which the defendants voiced at the time when the evidence was offered was that the inquiry concerned an immaterial fact. Watts' purchase occurred two years prior to the transaction between the plaintiff and the defendants. When the objection was made, the defendants did not claim that the two-year period was accompanied with a decline in the market value or a change in the character of the property; hence, nothing was called to the court's attention which would have warranted it in excluding a piece of evidence ostensibly admissible. It is now urged, however, that other evidence indicated that at the time of the transaction between these parties the house was in a state of disrepair. A party who seeks to exclude a piece of evidence should be explicit and disclose to the trial court all defects in the proposed proof which he expects to urge upon this court in the event of an appeal. Concealed weapons which will not be drawn upon the adversary until the appellate court is reached have no place in the trial of a cause; but,

even if we were warranted in believing that a change had occurred in the condition of the property, the record is silent as to when the change occurred. We are, therefore, of the opinion that the evidence disclosing the price stipulated in the Watts-Lauman contract was admissible and that the court did not err when it overruled the objection.

 The next three assignments of error challenge instructions given by the court to the jury. One of these follows:

"One of the questions for you to determine in this case from a preponderance of the evidence is, whether the transaction between the parties hereto in connection with the $20,000 note which has been received in evidence was a purchase by the plaintiff of said note at a discount and for the sum of $16,000, or whether the transaction in question constituted a loan of $16,000 by the plaintiff to the defendants."

This instruction was followed by another, which is not criticized by the defendants, and which declared that after a negotiable instrument has been once validly issued for a valuable consideration it becomes an article of commerce and can be bought and sold as freely as any other property at any price which the owner and prospective buyer fix. This instruction was accompanied with a definition of the rights of a bona fide purchaser and the presumptions in regard thereto. Then the court proceeded, thus:

"You are instructed that as a matter of law, the purchase by a party of the note secured by mortgage at such a discount as the parties may agree upon, does not constitute usury where the minds of the parties have met and the amount of discount is agreed upon.
* * *"

"If you find from a preponderance of the evidence that plaintiff purchased the $20,000 note and mortgage

in question from the defendants at a discount, and if you further find from the evidence that the $2,310 note sued on is complete and regular on its face; that plaintiff became the holder of it before it was overdue and without notice that it had been previously dishonored, if such was the fact; that plaintiff took it in good faith and for value; that at the time it was negotiated to the plaintiff it had no notice of any infirmity in the instrument, then in that event, your verdict must be for the plaintiff.''

Where the first negotiation of a promissory note is an exchange of it for money at a usurious rate of ''discount,'' to one who knows the instrument had not acquired validity by a previous transfer for value from maker to payee, the transaction is considered a usurious loan, and not a sale: *Bjorkman v. Columbia Wrecking & Fuel Co.*, 130 Or. 189 (279 P. 633); Webb on Usury, § 155; 27 R. C. L. Usury, p. 216, § 17; and 39 Cyc. Usury, 935.

We believe that the three instructions above quoted could readily have led the jury to believe that a payee could legally purchase from the maker the latter's note, and if a transaction could be made to assume the form of a purchase instead of appearing in its true light as a loan, the difference between the amount expressed in the note and the amount received from the lender by the maker would become a matter of no consequence. The courts do not permit any shift or subterfuge to evade the law against usury. The form into which parties place their transaction is unimportant. Disguises are brushed aside and the law peers behind the innocent appearing cloaks in quest for the truth. Even the parol evidence rule interposes no objection: Wigmore on Evidence, § 2414; 39 Cyc. Usury, 1054; *Terry Trading Corporation v. Barsky,* 210 Cal. 428 (292 P. 474). If the transaction was, in fact, a loan of the kind

denounced by the law of usury, no form to which the parties could resort for purposes of creating false appearances of innocence would be invulnerable to attack by the truth: 18 Kentucky Law Journal, 375. Since the instructions to which exception was taken could readily have misled the jury into the belief that the payee could purchase the note of the maker and that the so-called discount was immaterial, we believe that these assignments of error possess merit.

Further, we cannot conceive how it would be possible for the plaintiff to sustain to the $2,310 note the position of a bona fide purchaser and acquire rights greater than those which Pallett, Jr., possessed. We are willing to concede that the evidence could warrant a finding that Pallett, Jr., paid $2,310 of his own money for this note. Section 57-408, Oregon Code 1930, denies that any one can become a holder in due course who was a party to any fraud or illegality affecting the issuance of the instrument. If the $2,310 note was tainted with usury on account of the fact that it was an offspring of the alleged usurious contract, the plaintiff cannot purge itself of guilt by seeking to achieve the status of a bona fide purchaser; its manager and treasurer wrote the instrument with his own hand and was likewise the one who dictated the terms of the contract. It is axiomatic that under such circumstances the knowledge of Pallett, Sr., is imputed to his principal: *McCredie v. Elmer,* 132 Or. 368 (284 P. 573); *Farmers Bank v. Saling,* 33 Or. 394 (54 P. 190); Fletcher Cyclopedia Corporations, § 2215. The third of the above quoted instructions was certainly based upon the supposition that the plaintiff could become a bona fide purchaser in due course of the $2,310 note and, accordingly, was erroneous.

■ But it may be argued that since the jury was apparently satisfied that the Westmoreland property was worth $2,310 and since the defendants accepted the deed, the plaintiff can enforce liability on the note even though the jury also believed that the $20,000 note was of usurious character and that, hence, the above noted errors were not prejudicial to the defendants. Section 57-1202, Oregon Code 1930, provides:

"No person, corporation * * * shall directly or indirectly receive in money, goods or things in action, or in any other manner, any greater sum or value for the loan or use of money, than in this chapter prescribed. If pursuant to any arrangement, understanding or agreement, with the knowledge of the lender either as a part of the contract of borrowing or collateral thereto, whether made at, before or after the time the loan is made, and whether the same be made as a special arrangement, or in conformity to a regular rule, regulation or practice, there shall be paid by, or at the expense of, the borrower to the lender, his or its broker, officer, director or agent, any commission * * * or ⚬ compensation or gratuity whatsoever, whether in money, credit or other thing of value, as a consideration, compensation or inducement for obtaining any loan * * * the same shall be deemed a part of the interest charged on such loan * * *."

See also section 57-1203, Oregon Code 1930.

The following language taken from 39 Cyc. 971, has been much quoted:

"As a general rule any benefit or advantage exacted by the lender from the borrower, whatever be its name or form, which, added to the interest taken or reserved, would yield to the lender a greater profit upon his loan than is allowed by law is deemed usury. * * * Nor will a collateral transaction between the borrower and lender, whereby the lender may take profit, render the loan usurious when such transaction was entered into in good faith, and without usurious

intent, \* \* \* and the burden rests upon him setting up usury to show that a commission or other thing of value alleged to have been promised or received in addition to principal and legal interest rests upon a usurious consideration.''

In *Terry Trading Corporation v. Barsky*, 210 Cal. 428 (292 P. 474), the borrower when sued upon his note alleged that the lender had required him to agree to use the laboratory of a third party exclusively for the development of his films at an excessive price for the service rendered. A demurrer was sustained to the answer. In reversing the judgment of the lower court, the Supreme Court spoke thus:

''The courts will not permit an evasion of the Usury Law by any subterfuge, and it is always permissible to show that a transaction, ostensibly lawful, actually constituted a usurious loan and was made with intent to evade the statute: *Haines v. Commercial Mortgage Co.,* 200 Cal. 609, 616 (254 P. 956, 255 P. 805); 53 A. L. R. 725. Of course, the mere fact that defendant may have been required to enter into an unprofitable contract as a condition to a loan of money would not itself make the loan usurious. On the other hand, the law would be violated if the lender provided for a lawful rate of interest in the note itself, but required additional and excessive interest by the terms of a collateral agreement. Nor would it make any difference that the additional and excessive amounts of interest were designated as payments for services or materials furnished by the lender or his agent, if they were actually intended as interest. The test is whether there was the intent to evade the law, and the circumstances and negotiations which preceded the transaction may be material in determining such intent.''

In *C. C. Slaughter Co. v. Eller* (Texas), 196 S. W. 704, the lender loaned to his borrower, a dealer in Pierce-Arrow automobiles, $10,000 upon a note which recited a lawful rate of interest. A collateral agree-

ment accompanying the execution of the note made provisions whereby the lender would be enabled to keep himself informed as to the transactions of the borrower and the disposition of the $10,000 fund; it also stipulated that if the lender should desire to purchase a Pierce-Arrow automobile the borrower would sell one to him at a 20 per cent discount. After the automobile had been purchased at the discount, the borrower claimed that the note was usurious. The court concluded that the 20 per cent discount could be reconciled with a lawful rate of interest by concluding that it compensated the lender for his services in supervising the borrower's expenditure of money. We quote from the decision, thus:

"It is also stated generally that any advantage or benefit exacted which, added to the interest reserved, increases the compensation received for the loan to an amount in excess of the lawful interest constitutes usury, and if as a part of the transaction the borrower is required to buy or sell property at an exorbitant or inadequate price, as the case may be, and this is a cloak or device to disguise the true character of the transaction, it will not avail against the plea of usury.
* * *

"The contract in this case provided the means by which Slaughter might keep informed of the condition of Eller's business and prevent a use of the funds other than in the business which Slaughter was financing. The attention to the details by which this was to be accomplished necessarily imposed some labor. The borrower might legitimately agree to compensate the lender for services of such character, although performed in the interest of the lender (*Houghton v. Burden*, 228 U. S. 161, 33 Sup. Ct. 491, 57 L. Ed. 780; 39 Cyc. 981), provided always that such charges are not made a mask behind which to conceal the true purpose of the parties. We think the contract in this case is not necessarily usurious, but whether it is or not

would be dependent upon the intention of the parties, to be ascertained in accordance with the principles announced in the foregoing authorities.''

In *Winder Nat. Bank v. Graham*, 38 Ga. App. 552 (144 S. E. 357), the facts were: The defendant and her son applied to the bank for a loan of $900. As a condition precedent to the making of this loan the bank demanded that the defendant sign a note in the sum of $1,000 as surety for the son to cover interest on an old loan. The defendant was in no way connected with or responsible for the old debt. The full legal rate of interest was charged upon the $900 note and this action was brought for the purpose of enforcing payment. The defendant plead usury. In affirming the judgment of the lower court which sustained the plea, the court said:

''We think the plea of usury was sustained by the evidence as a matter of law, and, therefore, that the court committed no error in directing the verdict in favor of the defendant. According to our interpretation of the decision of the Supreme Court in *Bishop v. Exchange Bank*, 114 Ga. 962 (2), 41 S. E. 43, the promise of Mrs. Graham as surety, contained in the note sued on (assuming that she executed it), to become responsible for a debt of W. G. Graham in the sum of $1,000 was nothing more nor less than usury; and, under the act of 1916 (Ga. Laws 1916, p. 48, Park's Code Supp, 1922, § 3438), was subject to be forfeited. Compare *Bank of Lumpkin v. Farmers' State Bank*, 161 Ga. 801, 132 S. E. 221. * * * The usury springs from the fact that the defendant was required *at all* to sign the note as surety, when the same was executed as a condition precedent to the making of a loan to her by another, upon which the full legal rate of interest was charged, and when as to her there was absolutely no other benefit or consideration for her promise as contained in the note.''

It seems to us that our statute defining usury when read in the light of the foregoing authorities demands a conclusion that if the $20,000 note was usurious the note now sued upon was likewise such. The defendants did not desire to purchase the Westmoreland property, and submitted to the plaintiff's demands as an extra consideration for the loan. It was a favor, premium, or inducement exacted by the plaintiff as a condition precedent so as to obtain a greater yield for the use of its money. Both notes were the fruits of the one intent. The two notes are united by that common intent. Had the defendants refused to purchase the Westmoreland property they could not have obtained the $16,000. For the reasons above, it is impossible to enter judgment for the plaintiff upon the theory that the jury's verdict is tantamount to a finding that the Westmoreland property was worth the amount expressed in the note.

The next assignment of error challenges an instruction which informed the jury that a borrower who knowingly pays usurious interest cannot recover the same. This instruction had no application to any issue in this action because the defendants at the conclusion of the presentation of the evidence waived the counterclaim which sought recovery of the alleged usurious interest. However, section 57-1203, Oregon Code 1930, forfeits "the entire debt" to the school fund, and in *Beach v. Guaranty Sav. Ass'n.*, 44 Or. 530 (76 P. 16), this court held that a borrower who has paid usurious interest cannot recover it.

The seventh assignment of error is predicated upon a refusal of the court to charge the jury that if the plaintiff refused to loan the defendant $16,000 unless the latter would purchase the Westmoreland property "the price contracted to be paid by the defendants for

the Westmoreland property which was in excess of the true value of the property must be admitted to be part of the interest charged on the $16,000 loan.'' The court properly declined to subscribe to this instruction because it omitted the element of usurious intent. However, as we have already indicated, parties cannot conceal in an innocent appearing sale, which is collateral to the loan, a consideration which is, in fact, usurious interest: Williston on Contracts, 2964; Oregon Code 1930, § 57-1203; *Bishop v. Exchange Bank,* 114 Ga. 962; 41 S. E. 43; *Dale v. Duryea,* 49 Wash. 644 (96 P. 223); and *White v. Anderson,* 164 Mo. App. 132, 147 S. W. 1122.

■ The eighth assignment of error contends that the circuit court erred when it failed to instruct the jury that the defendants' knowledge that the transaction made provision for usurious interest was no defense; that is, that such knowledge would not prevent the transaction from being usurious. This instruction could very properly have been given.

For the reasons foregoing, the judgment of the circuit court is reversed and the cause is remanded.

BEAN, C. J., RAND and KELLY, JJ., concur.