Argued January 7, affirmed April 13, 1960

# W. D. MILLER CONSTRUCTION CO. *v.*
# DONALD M. DRAKE COMPANY
### 351 P. 2d 41

*Marshall C. Cheney, Jr.*, Portland, argued the cause for appellant. With him on the brief were Koerner, Young, McColloch & Dezendorf, Portland.

*R. B. Maxwell*, Klamath Falls, argued the cause for the respondent. With him on the brief was H. F. Smith, Klamath Falls.

Before McAllister, Chief Justice, and Rossman, O'Connell and Harris, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Donald M. Drake Company, a corporation, from a judgment in the sum of $13,638.92 which the circuit court entered in favor of the plaintiff, W. D. Miller Construction Co., also a corporation. The case was tried without a jury and the judgment is based upon findings of fact and conclusions of law. The plaintiff maintains a plant in Klamath Falls from which it furnishes transit-mixed concrete to contractors. The defendant, on June 22, 1955, entered into two contracts with the United States Navy whereby it bound itself to build several buildings at the Klamath Falls air base. Construction of the floors, foundations and other parts of the buildings required the use of transit-mixed concrete. July 12, 1955, the plaintiff and the defendant entered into a contract whereby the plaintiff agreed to deliver to the defendant transit-mixed concrete of the quality specified in the contract between the defendant and the Navy for the work just mentioned. According to the plaintiff, it supplied to the defendant in the period of July 15, 1955, to November 19, 1956, transit-mixed concrete of the required kind and of the value of $66,170.20. It alleged that of that sum $13,638.92 remained unpaid when this action was filed. The defendant not only denied that it was indebted to the plaintiff, but submitted a counterclaim in the sum of $35,515.46 which was based upon averments that the concrete which the plaintiff delivered to the defendant did not meet the terms of the agreement between plaintiff and defendant. The counterclaim also alleged:

"By reason of plaintiff's said breach of its sub-

contract, the performance of said prime contracts by defendant was stopped by order of the United States Navy from September 3, 1955 until October 11, 1955, and defendant sustained damages from said delay and from additional costs and expenses incurred by reason of the said breach and resulting contract changes in a total amount of $35,515.46."

The circuit court denied the defendant's prayer for judgment upon its counterclaim and, as we have said, awarded the plaintiff judgment in the sum of $13,638.92.

The contract between the plaintiff and the defendant bound the former to deliver to the defendant transit-mixed concrete which would meet the demands of a specification written by the United States Navy known as Bureau of Yards and Docks Specification No. 13 Yd and of another known as Federal Specification SS-A-281.

In appealing, the defendant submits eight assignments of error. We will now consider them.

The first assignment of error reads as follows:

"The court erred in denying Appellant's motion for dismissal."

The motion for dismissal, as expressed by the defendant's counsel in the trial court, gave as its basis the following reason:

"* * * Plaintiff has introduced in evidence, as a part of it's case, the purchase orders which are involved here which require Plaintiff to supply concrete meeting the contract and the specifications; that there is no proof, no evidence offered by Plaintiff to show that any of the concrete which it supplied met the specifications. Hence, Plaintiff is not entitled to recover. There is a failure of proof, and its complaint should be dismissed."

The second assignment of error asserts that the circuit court erred when it overruled the defendant's

objections to some questions which plaintiff's counsel propounded to Mr. W. D. Miller, the president of the plaintiff corporation. The objections urged that the questions called for expert opinion evidence and that Mr. Miller had not qualified as an expert.

Since the second assignment of error challenges the admissibility of evidence which the circuit court took into account when it denied the defendant's motion for a dismissal, we will resolve the second assignment of error before giving attention to the first.

One of the questions which was propounded to Mr. Miller and to which the defendant objected reads as follows:

"Mr. Miller, to the best of your knowledge did any of the concrete delivered by your Company to the Drake Company, other than the amounts delivered in this 3-day period, fail to test satisfactorily?"

After the objection had been overruled the witness answered:

"A. No, the rest of the concrete, there was no question about it."

Having given that answer Miller was asked:

"On the basis of that, Mr. Miller, will you tell us whether the concrete delivered to the Drake Company under these purchase orders were mixed in accordance with the Specifications 13 YD, and in accordance with the designs set up by representatives of the Navy with representatives of the Miller Construction Company?"

Defendant objected to the question:

"* * * for the reason and upon the ground that it is a matter of testing, a matter of expert testimony, and the conclusion of this witness—this witness is not qualified to be able to answer."

The objection was overruled and Miller answered:

"Yes, the concrete was mixed in accordance with those designs."

Those are the questions, answers and rulings which are the subject matter of the second assignment of error.

It will be noticed from the first of the two questions that the plaintiff conceded that it delivered to the defendant during a three-day period concrete which did not meet the specifications. According to the plaintiff, the three-day period was July 27, 28 and 29, 1955. The plaintiff claims that all of its other deliveries complied faithfully with the contract and the specifications. It allowed the defendant a credit of $417.56 on account of the substandard concrete which it delivered July 27, 28 and 29. The defendant passed on the credit to the Navy and the latter accepted it. The evidence indicates that the Navy in due time accepted the buildings and, in making payment to the defendant, deducted from the contract sum the credit of $417.56 which we just mentioned.

We will now determine whether error was committed when the defendant's objections to the two challenged questions were overruled.

The plaintiff states that Mr. Miller was not offered as an expert witness and that the questions propounded to him called for nothing except the results of the observations which he made while overseeing the performance of the contract. The plaintiff claims that expert knowledge was not needed to enable Miller to answer the questions.

Occasionally samples of the concrete which the plaintiff delivered to the defendant were submitted to Northwest Testing Laboratories in Portland, and after that concern had subjected them to tests the Navy and

the defendant were given the results. At times the plaintiff was acquainted with the results. The latter were accepted without cavil by all three and were deemed authoritative. Neither the plaintiff nor Miller ever attempted to subject the concrete to any tests or claimed the ability to test concrete for its compliance with the Navy's specifications.

Mr. Miller is apparently a very young man. Although he was president of the plaintiff corporation when he testified, he had held that office then for only a few months. In July 1955, when the plaintiff and the defendant entered into their agreement, Miller was the secretary of the company. Evidently his father had established the business and had formed the corporation. The father was president of the latter until his death. When death occurred the son (the witness whose testimony is under review) succeeded him as president. According to the son, he had been connected continuously with the company for only two years. Prior to that time "I worked there," so he testified, "during summer vacations, during college terms, and so forth." He described as follows the work he performed for the plaintiff:

> "I did all manner of things, Mr. Dezendorf. As I said, I was employed to learn the business, and, oh, I worked in the batch plant, I even worked on trucks; I did odd jobs, all manner of things.

> \* \* \*

> "The first year, as I stated yesterday, I was employed to learn the business. I learned to batch concrete, mix it in the truck, delivered it. On some jobs for instance we had, we were contracting, we even placed it and finished it."

He swore that his purpose was to gain first hand information about all phases of the business, especially

about the mixing and delivery of transit-mixed concrete. According to him, he participated in and was familiar with the negotiation of the contract between the plaintiff and the defendant. He added:

"Initially I was in on the design of the concrete with certain Naval representatives. * * *"

He was conversant, so he swore, with the specifications written by the Navy which governed the concrete that his company was required to furnish to the defendant. We take the following from his testimony:

"Q Did you work with representatives of the Navy in setting up the formulas under these specifications 13 YD?

"A Yes, I did."

Mr. Miller testified that he went to the air base virtually every day in the period covered by this case. The record does not suggest that the plaintiff's operations are large and that its products are many. Its business seems to center in concrete. It has eight trucks.

So far as we can determine from the record, an intelligent man who sought to become conversant with a business and who pursued the course which Mr. Miller described should be able to render himself familiar in two years with the production and delivery of transit-mixed concrete in a plant the size of the plaintiff's so that he could answer intelligently questions such as those that were propounded to Miller.

We return now to the two questions which are under attack. The first of them asked Miller whether the concrete which the plaintiff delivered to the defendant, other than the three specific amounts which the plaintiff conceded were substandard, failed "to test satisfactorily." We do not believe that the question asked

Miller for the results of any test which he performed, for no one claimed that he or his company had conducted any. The question was put upon redirect examination and its purpose seemingly was to determine whether the substandard concrete that was delivered July 27, 28 and 29 was the only concrete that proved to be defective. We think that it is apparent that the question did not ask the witness for his opinion as an expert, but requested him to focus or marshall the testimony that had already been given. By returning to the answer which the witness gave it will be seen that he understood the question in that way. He answered, "No, the rest of the concrete, there was no question about it." By his answer he indicated that the concrete which the plaintiff delivered on July 27, 28 and 29 was the only material over which trouble had occurred.

The second question which is subjected to attack asked the witness whether the concrete which his company delivered to the defendant was "mixed in accordance with the specifications 13 YD, and in accordance with the designs set up by representatives of the Navy with representatives of the Miller Construction Company." So far as we can ascertain, the question inquired of Miller whether his company had employed the ingredients or components required by the Navy specifications in mixing the concrete which it delivered to the defendant. Nothing has been pointed out to us which indicates that the witness was "not qualified" to answer a question of that kind. He was the president of his company and was, therefore, responsible for seeing to it that the ingredients demanded by the Navy specifications went into the hopper.

We do not believe that either of the two questions asked for the opinion of an expert. But if they did,

we must bear in mind that the trial judge held that Miller was qualified to answer the questions.

Wigmore on Evidence, 3rd ed. § 561 states:

"Secondly, and emphatically, the *trial Court must be left to determine*, absolutely and without review, the fact of possession of the required qualification by a particular witness. In most jurisdictions it is repeatedly declared that the decision upon the experimental qualifications of witnesses should be left to the determination of the trial Court."

This court has not gone so far as to hold that the trial judge's ruling upon the witness' qualification is beyond review, but it has many times ruled that the qualifications are largely in the trial judge's discretion: *Douglas County v. Myers*, 201 Or 59, 268 P2d 625; *Fidelity Sec. Corporation v. Brugman*, 137 Or 38, 1 P2d 131, 75 ALR 1333; *Goldfoot v. Lofgren*, 135 Or 533, 296 P 843; *Crosby v. Portland Ry Co.*, 53 Or 496, 100 P 300, 101 P 204; *State v. White*, 48 Or 416, 87 P 137; *Buckman v. Imbler Lumber Co.*, 42 Or 231, 70 P 811; *Farmers' National Bank v. Woodell*, 38 Or 294, 61 P 837, 65 P 520.

Assuming, but not holding, that the two questions could be answered only by a qualified expert, we are aware of no reason for believing that the trial court erred when it held that Miller was duly qualified.

We return to the first assignment of error which is based upon the denial by the circuit court of the defendant's motion for dismissal of the complaint. As expressed at the time of the trial, this motion contended, "there is no proof, no evidence offered by plaintiff to show that any of the concrete which it supplied met the specifications." The defendant's brief states, "proof of any performance of the agreement by Respondent [plaintiff] is non-existent."

Mr. W. D. Miller, whom we have mentioned, was the only witness that the plaintiff called. The plaintiff, however, presented a large amount of documentary evidence which showed that it delivered to the defendant the quantity of concrete mentioned in the complaint. The defendant's contentions which are quoted in the preceding paragraph are based in part upon the proposition already mentioned, that is, that Miller was not competent to have given the testimony which came from him. For reasons stated in a preceding paragraph, we believe that Miller was competent.

The plaintiff presented evidence which showed that in the period which began on or after July 15, 1955, and ended November 19, 1956, it delivered to defendant transit-mixed concrete for which it was entitled to receive under its contract with the defendant $66,170.20. The evidence also showed that of that amount $13,638.92 remained unpaid when the complaint was filed. The evidence indicated that the concrete which was delivered July 27, 28 and 29 would have been valued under the contract in the sum of $2,200 had it met the demands of the specifications. It was conceded, however, by the plaintiff that the concrete which was delivered upon those three days was substandard. All of its other deliveries to the defendant, according to the plaintiff, met the requirements of the specifications. Upon the other hand, the defendant insisted that concrete delivered to it by the plaintiff on days in addition to July 27, 28 and 29 failed to comply with the specifications.

The substandard concrete delivered in the period of July 27, 28 and 29 would have had a value, as we have said, of $2,200 had it been of the quality required by the contract. The sum of $2,200 is less than 4 per cent of $66,170.20 which represents the total value of

all the deliveries made by the plaintiff to the defendant. There is no contention that the substandard concrete was delivered in bad faith or that the plaintiff's deviation from its contractual duty was witting. We have taken note of the fact that when it developed that the concrete delivered July 27, 28 and 29 did not meet the demands of the specifications the plaintiff allowed the defendant a credit of $417.56 to which the defendant assented. The defendant passed on the credit to the Navy and the latter accepted it. The evidence previously mentioned renders it manifest that the breach which occurred when the substandard concrete was delivered could be readily adjusted to the satisfaction of all by the plaintiff's allowance of a credit of $417.56. The following testimony given by Mr. Webster Smith, the defendant's general superintendent, refers to the credit of $417.56:

"A The next one here is Donald M. Drake Company Invoice 3837, credit due from Miller in lieu of increasing the cement content.

"Q Is that an invoice that was actually rendered to Miller by your company?
"A That is right.

"Q And what is the amount of it?
"A $417.56.

"Q What is that made up of?
"A That was the credit that Miller allowed for the concrete in the buildings that didn't pass.

"Q And did your company, in turn, pass that credit on to the Navy?
"A That is right.

\*     \*     \*

"Q Mr. Smith, calling your attention to the testimony in connection with miscellaneous charges in connection with both contracts, the first item about which you testified was invoice 3837, credit

due in the amount of $417.56. You recall your testimony about that?

"A No. I probably said it was paid.

&ast; &ast; &ast;

"Q All right, now. What did you say about that item?

"A I said it was paid.

&ast; &ast; &ast;

"A If I remember right I testified yesterday we had credited the Navy with it. .

"Q And as a matter of fact you were given credit by the Miller Company for that amount, were you not?

"A That is what it says here.

"Q And that was an adjustment on the particular concrete that did not set up to strength in time, was it not?

"A On these buildings, yes."

The Navy in due time accepted the buildings and, in paying the defendant the contract sums, deducted therefrom $417.56.

■ We see from the foregoing that after it developed that the deliveries of concrete on July 27, 28 and 29 did not conform to the requirements of the specifications an adjustment was readily worked out whereby the plaintiff allowed the defendant a credit of $417.56, and when the defendant passed on the credit to the Navy all differences were composed. In our belief an accord and satisfaction was thereby effected: Restatement, Contracts § 417 comment (a); *Schumacher v. Moffitt*, 71 Or 79, 142 P 353; *Brady v. Selberg*, 154 Or 477, 60 P2d 1104. In *State ex rel v. Funk*, 105 Or 134, 199 P 592, 209 P 113, it is said, "After a valid accord and satisfaction the original liability is discharged."

Hence, after the defendant accepted the credit for $417.56 and incidental thereto waived its right to demand that the plaintiff deliver concrete which would meet the Navy's specifications, there no longer existed any breach of the contract which the plaintiff and defendant formed July 12, 1955.

We have stated that the defendant contends that the plaintiff delivered to it substandard concrete at times other than July 27, 28 and 29. It mentions particularly August 4, 5 and 12, 1955. In order to establish that the plaintiff delivered substandard concrete on August 4, 5 and 12 the defendant depended largely upon two items of evidence. One of the two items was a group of eleven letters, addressed to the defendant, which are concerned with the concrete and which the defendant claimed came to it through the mails from the Navy. The other item of evidence (Exhibit 24) was a report dated September 1, 1955, which the Northwest Testing Laboratories prepared. The report stated that it (the report) was prepared for "District Public Works Officer, Thirteenth Naval District." It indicated that the laboratory had made two tests of material on August 4, 1955, to determine whether the material met the requirements of specification D-1 which demanded resistance to a crushing force of 2500 pounds at the end of 28 days of aging. One of the items of material had a weight of 29.1 pounds and of 7 days aging. The report stated that it withstood a load of 4420 pounds. The other test was of material which had a weight of 28.7 pounds and 28 days of aging. It yielded to a load of 2410 pounds.

We will now undertake to determine whether or not the group of eleven letters which constitute the first item of evidence above mentioned indicate that the plaintiff delivered to the defendant substandard con-

crete on August 4, 5 and 12. Those eleven letters were produced by the defendant's counsel although Mr. Franklin Drake, Executive Vice President of the defendant, later testified that the defendant received them through the mails. Nine of the letters were typed upon letterheads entitled as follows: Navy Department, Resident Officer-in-Charge of Construction, Klamath Falls Air Force Base, Post Office Box 301, Klamath Falls, Oregon. Two of them have this printed letterhead: District Public Works Office, Thirteenth Naval District BLG 232, United States Naval Station, Seattle 90, Washington. The letters bore the signatures of various individuals. After one of the signatures there was typed "Project Engineer by direction of the Resident Officer in Charge of Construction." Another had typed after his name "Lt., (CEC), U.S.N. Resident Officer in Charge of Construction."

No officer or employee of the Navy testified. These letters did not come from the Navy's files nor from the files of any other government agency. They were produced by the defendant, evidently from its files. When one of the letters was shown to Mr. Miller he stated, "This is the first time I have seen this letter." He made a similar statement concerning some of the other letters, but thought that he had possibly seen a part of or an excerpt from one of the letters. Mr. Miller, referring to the Navy, testified:

"We never received letters from them. We never had any dealing with them."

None of the letters was addressed to the plaintiff. No one described the Navy's method of inspecting the work and of assuring itself, apart from occasional tests made by Northwest Testing Laboratories, that the work conformed to the specifications. If writing letters of the

kind represented by these exhibits constituted a part of the Navy's practice, the fact was not mentioned.

The defendant stated in the trial court that the letters were offered for the purpose of showing that "the plaintiff's concrete had not met the required specifications." He added, "The letters are binding upon both plaintiff and defendant as official acts of the Navy." The trial judge sustained the plaintiff's objections that the letters were hearsay as to the plaintiff and explained:

> "* * * so far as they relate to whether or not the concrete met any standards that were necessary, are pure hearsay and should be excluded as evidence under the hearsay rule because they do not in any respect give the possibility of cross-examination to the plaintiff * * * and in the Court's opinion they are not official acts of the government admissible under the exception to the hearsay rule * * *."

The transcript contains nothing which indicates that copies of these letters or any entry concerning them are in the files or other records of the Navy. When a document is taken from the files of a government office, where the public could inspect it, its authenticity is to that extent assured. But these documents came from the defendant's files. No one testified that the defendant produced its entire file. If the defendant answered the letters or took issue with any statement made in any of them the fact was not disclosed.

ORS 43.360 provides:

> "Any paper or the record of any instrument filed or recorded in the office of any officer or agent of United States or of any of its departments or bureaus, or a copy of that paper or record certified by the officer or person who has legal custody, may be read in evidence with like effect as the original. * * *"

ORS 43.330 says:

"Other official documents may be proved as follows:

"(1) acts of the executive or administrative departments of this state and of the United States by the records of the departments, certified by the department heads; or by public documents prepared or printed by order of the Legislative Assembly, Congress, or by either house."

As we have said, there is nothing whatever that vouches for the authenticity of these letters. They did not come from any government files and have no certification that vouches for their trustworthiness.

*Douvas v. Newcomb,* (Okl.), 267 P2d 600 says:

"* * * A record cannot be denominated a public record within our understanding of the meaning of the term unless, being required to be kept, it is so recorded or filed that it may be subject to inspection by any person for information as to what it shows. * * *"

We take the following from *Arnold v. Thompson & Spear Co.,* 279 F 307:

"Through the witness, the corporation offered a carbon copy of a letter purporting to have been written to Arnold by R. E. Bakenhus, who described himself as 'Assistant to Bureau.' It is written on a letter head of the Bureau of Yards and Docks. The witness said that the original was in the files of the submarine base at New London. Over the objection of Arnold it was received. Clearly it was not competent as a copy of the files of the Bureau of Yards and Docks, because not certified as required by the statute. If treated as a copy of a letter sent to Arnold, who, presumably, possessed the original, it was not admissible, since there was no proper foundation laid.

"There are other reasons why it should not have

been received. It does not purport to be an acceptance of the work. It declares that the work would be treated as completed 'for the purpose of the damage clause of the contract.' This limits its effect. Nor does it pretend to be an acceptance, even for that purpose, by the Bureau of Yards and Docks or by the Navy Department. There is no proof that Bakenhus had authority to act for the bureau or the department. The mere fact that he describes himself as 'Assistant to Bureau' does not establish his authority to speak for it."

■ We do not believe that the letters under consideration can be employed for the purpose of determining whether or not the concrete which the plaintiff delivered met the demands of the specifications.

We come now to exhibit 24, previously described. It is the report which Northwest Testing Laboratories rendered upon two samples of concrete which "District Public Works Officer, Thirteenth Naval District" had submitted to the laboratory. The concrete was required to meet the demands of specification D-1 which meant that it was compelled to withstand a pressure of 2500 pounds after it had had the benefit of 28 days of aging. According to the report, one of the samples, which had aged for only 7 days, withstood a pressure of 4420 pounds whereas the other sample which had aged for 28 days yielded to a pressure of 2410 pounds. The exhibit appears to be a copy, and it may be that one or the other of the two figures of 4420 and 2410 inadvertently was erroneously entered.

■ Exhibit 24 received a minimum of mention in the trial court. Mr. Franklin Drake, aforementioned, when shown that document and several others, answered yes, that he had received them from the Navy. Mr. Schwartz, the proprietor of Northwest Testing Laboratories, upon being shown seven documents, including exhibit

24, answered, "Yes, we made these tests." That was substantially the only direct mention which exhibit 24 received in the trial court. Exhibit 24 identifies the structure or facility with which the concrete mentioned in it was concerned as "Flight Assembly." So far as we are able to determine from the record, the defendant has made no claim that the Navy rejected any work in that structure or that any defect developed in it. The record does not indicate whether or not the concrete which was the subject matter of exhibit 24 was used in any construction work. Unless the concrete which is mentioned in exhibit 24 was employed in construction work its failure, if any, to meet the demands of the specifications would not entitle the defendant to any relief. We therefore do not believe that exhibit 24 establishes that the plaintiff delivered to the defendant any substandard concrete on August 4, 1955.

The findings of fact entered by the circuit court state:

"That at the request of defendant plaintiff between the dates of July 15, 1955, and May 23, 1956, did deliver unto the defendant for the use of defendant Transit Mixed Concrete under said contracts in an amount valued under said contracts in the sum of $66,177.20;

\* \* \*

"That defendant received and used all of said concrete, goods and materials delivered by plaintiff during the period of time from July 15, 1955, to November 19, 1956;

\* \* \*

"That the Court finds that the plaintiff substantially performed the contracts of sale it entered into with the defendant during the period from July 15, 1955, to and including November 19, 1956, for the delivery of concrete, goods and materials;

"That defendant specially requested, received

and used all of said concrete, goods and materials delivered by plaintiff to defendant during said period of time;

*      *      *

"That defendant has failed to prove by any satisfactory evidence that any concrete delivered by plaintiff except that delivered on July 27, 28 and 29, 1955, was substandard;

*      *      *

"That defendant on November 19, 1956 was indebted to the plaintiff in the sum of $14,063.48 less the sum of $424.56 or the sum of $13,638.92."

■■ We believe that all of those findings are supported by substantial, competent evidence. ORS 17.435 gives to those findings the effect of a verdict. They can be set aside only for the reasons and upon the ground to which a verdict would be required to yield. *Brownell v. Heitman*, 125 Or 515, 266 P 1067.

In our opinion, the assignment of error under consideration is without merit.

Assignments of error 3, 4, 5, 6 and 7 are based upon proposed findings of fact, objections thereto which the defendant made and upon the findings which the trial judge entered. These assignments of error call for nothing except a study and analysis of the evidence. We have given to the transcript of evidence painstaking attention and bestowed similar study upon the exhibits. We believe that the findings of fact which the circuit court entered are supported by substantial evidence and that they correctly portray the facts. Such being our belief, we do not believe that it is necessary to set forth in this opinion the manner in which we became persuaded that the evidence supports the findings. We reject as without merit assignments of error 3, 4, 5, 6 and 7.

The eighth assignment of error, being the last, com-

plains because judgment was entered for the plaintiff and the defendant's counterclaim was denied. The counterclaim in the sum of $35,515.46 was based upon charges that:

1. The plaintiff breached its contractual duty to deliver concrete in compliance with the specifications which the Navy had written;

2. On account of the incorporation into the buildings of inferior concrete the Navy on or before September 3, 1955, stopped all construction work at the Klamath Falls Air Force Base and did not permit resumption of work until October 11, 1955; and

3. By reason of the period of idleness lasting from September 3 until October 11, 1955, the defendant sustained damages in the amount of $35,515.46.

The issue which this assignment of error submits is whether or not the plaintiff was the cause of the Navy's order which brought a cessation of all construction work at the Klamath Falls Air Force Base. No one connected with the Navy gave any testimony whatsoever. Two other contractors had contracts similar to the defendant's for construction work at the Klamath Falls Air Force Base. Their contracts, like the defendant's, required the use of concrete. Two other suppliers of transit-mixed concrete supplied contractors, other than the defendant, who were engaged in construction work at the air base with transit-mixed concrete. On September 3, 1955, when the Navy ordered the defendant to suspend all work at the air base it halted not only the defendant but also the other two general contractors. When the Navy ordered the defendant to cease operations it gave no order to the plaintiff and had no communication with it. The plaintiff's operations at the air base came to a halt because

the defendant at that time gave no orders for the delivery of concrete. When the Navy stopped the defendant's operation the other two suppliers of transit-mixed concrete likewise were not called upon for delivery of any concrete. In the interval of September 3 to October 11 the defendant upon one occasion wished to perform some work of a special nature at the air base involving the use of concrete, and upon application to the Navy secured permission for the plaintiff to make delivery of the needed transit-mixed concrete. The plaintiff thereupon delivered the needed concrete.

Toward the end of the trial the circuit court judge, finding that he would be compelled to rule whether or not the plaintiff was in any way responsible for the shut down from September 3 to October 11, declared, "One of the vital issues in this case, I think, is the reason for the shut down." Presently he added, "So far we have had very little, if any, direct evidence for the shut down. Your evidence has not been direct." The findings of fact state:

> "That defendant has failed to prove by a preponderance of the evidence that any delay in its operations was the proximate result of any breach of contract on the part of plaintiff."

■ Without setting forth a further review of the evidence we state our belief that the finding just quoted is well supported by the evidence. We therefore conclude that the eighth assignment of error is without merit.

The above disposes of all of the assignments of error. We have found no merit in any of them. We have, however, given to each of them careful attention.

The judgment of the circuit court is affirmed.