Argued July 8, reversed and remanded September 5, 1968

ASHCRAFT ᴇᴛ ᴀʟ, *Respondents, v.*
SAUNDERS, *Appellant.*

444 P. 2d 924

*William E. Taylor*, Gold Beach, argued the cause and filed briefs for appellant.

*Paul W. Haviland*, Medford, argued the cause for respondents. On the brief were Haviland & Karaman.

Before Perry, Chief Justice, and McAllister, Sloan, O'Connell, Goodwin, Denecke and Lusk, Justices.

LUSK, J.

This is an action for damages for timber trespass. Plaintiffs recovered a judgment for treble damages pursuant to ORS 105.810 and defendant appeals.

Defendant concedes the trespass, but contends that plaintiffs are entitled to recover at most double damages, as provided in ORS 105.815. The trespass was committed by Samuel A. Agnew, through an agent. Agnew died before the action was commenced and the defendant is administrator of his estate. The question, which was raised on the trial, is whether ORS 105.810 is a penal provision; and, if so, whether it can be enforced against the estate of a deceased wrongdoer.

We have two statutes to consider. ORS 105.810 reads:

> "Except as provided in ORS 477.090, whenever any person, without lawful authority, wilfully injures or severs from the land of another any produce thereof or cuts down, girdles or otherwise injures or carries off any tree, timber or shrub on the land of another person, * * * in an action by such person * * * against the person committing such trespasses if judgment is given for the plaintiff, it shall be given for treble the amount of damages claimed, or assessed for the trespass. In any such action, upon plaintiff's proof of his ownership of the premises and the commission by the defendant

of any of the acts mentioned in this section, it is prima facie evidence that the acts were committed by the defendant wilfully, intentionally and without plaintiff's consent."

ORS 105.815 reads:

"If, upon the trial of an action included in ORS 105.810, it appears that the trespass was casual or involuntary, or that the defendant had probable cause to believe that the land on which the trespass was committed was his own or the land of the person in whose service or by whose direction the act was done, * * * judgment shall be given for double damages."

Thus, the legislature has provided that one who wilfully or intentionally cuts down the trees of another, is liable in treble damages, ORS 105.810, but, if the trespass was casual or involuntary or the trespasser had probable cause to believe that the land upon which he trespassed was his own, he is liable in double damages, ORS 105.815.

In *Kinzua Lbr. Co. v. Daggett et al*, 203 Or 585, 281 P2d 221, a suit in equity, we considered the contention that ORS 105.815 was penal in character and, for that reason, that recovery under that section could not be sustained because equity will not enforce a penalty. In an exhaustive opinion by Mr. Justice ROSSMAN we held that the provision was not penal because "[w]hen a person, through a mistake concerning the location of a property line, fells a tree, he has done nothing for which a penalty ordinarily is imposed." 203 Or at 606. We concluded that the legislature by this provision granted the victim of the trespass an "accumulative recovery so that he would have something left in his pocket after he had discharged the expenses of the litigation. The award made in that manner may be deemed

extraordinary damages or statutory-liquidated damages." Id. at 607. *Arguendo,* the court, in referring to the difference in the types of conduct proscribed by the two statutes—a trespass that is "casual or involuntary" as in ORS 105.815, and a trespass that is "willful" or "intentional" as in ORS 105.810—said: "From the foregoing we see that ORS 105.810 contains language of the character that is generally appropriate to penal statutes, but ORS 105.815, far from containing expressions of that kind, repels any inference that it is concerned with mens rea." Id. at 591-592. See, also, the companion case, *Kinzua Pine Mills Co. v. Daggett,* 203 Or 581, 281 P2d 231.

■ Upon the authority of the *Kinzua Lumber Company* case we said in *Gordon Creek Tree Farms v. Layne et al,* 230 Or 204, 212, 237, 358 P2d 1062, 368 P2d 737, that the provision for treble damages in ORS 105.810 was intended as a statutory measure for the recovery of "punitive or exemplary damages." Whether this statement is dictum or not, it is correct.

Treble damages under this statute cannot be considered what are sometimes called "accumulative damages," or "extraordinary" or "statutory-liquidated damages" as we termed them in the *Kinzua Lumber Company* case; for all such damages may be recovered under ORS 105.815 and any award beyond double damages must, of necessity, be punitive or penal in character. See *Fairview Farms, Inc. v. Reynolds Metals Company,* 176 FS 178, 189 (D Or).

In *Lane v. Schilling et al,* 130 Or 119, 279 P 267, 65 ALR 1042 (1929), an action for libel, we held that punitive damages could not be recovered against the receiver of a bank which had written and published the libelous matter. Authority for this decision was found in the well established rule that such damages cannot

be recovered against the personal representative of a deceased tortfeasor, notwithstanding the Oregon statute, which at that time provided for the survival of tort actions with certain exceptions not now pertinent, Oregon Laws 1920, §§ 378-379.[1] The reason for the rule was thus stated in *Sheik v. Hobson, Admr.*, 64 Iowa 146, 19 NW 875, and quoted by the court in *Lane v. Schilling*, supra, 130 Or at 129:

> " 'Plaintiff had a right of action, on account of the slanderous words spoken by Rush, for such sum as would compensate her for the injury. This was her cause of action, and this is what was preserved to her by the statute at his death. But she had no personal interest in the question of his punishment. So far as he was concerned, the punitory power of the law ceased when he died. To allow exemplary damages now would be to punish his legal and personal representatives for his wrongful acts, but the civil law never inflicts vicarious punishment.' "

See, also, *Stevenson v. Stoufer*, 237 Iowa 513, 517, 21 NW2d 287. As the court said in *Kirk v. Commissioner of Internal Revenue*, 179 F2d 619, 622 (1st Cir), 15 ALR2d 1031, 1035:

> "In short, we think the general rule today with respect to the survival of tort actions against decedents' estates is that actions essentially for penalties do not survive for the reason that a decedent is beyond punishment, but that actions to recompense or compensate a plaintiff for a harm inflicted upon him by a decedent do survive, for an estate can, and we think should, compensate for injury to the same extent as the decedent had he lived."

■■ The treble damages provision of ORS 105.810, while penal in character, is not a penalty in the strict sense, for it is not imposed for an offense committed

---

[1] The exceptions have since been eliminated: ORS 30.075, 30.080, 121.020.

against the State. *Huntington v. Attrill,* 146 US 657, 667, 13 S Ct 224, 36 L ed 1123; 36 Am Jur 2d 643, Forfeitures and Penalties § 51. The reason, however, for nonsurvival of the cause of action is the same in either case—the offender is "beyond punishment." *Lane v. Schilling, Kirk v. Commissioner of Internal Revenue,* both supra.

We have been cited to no case, and have found none, in which recovery of a statutory penalty or statutory punitive damages has been sustained against the estate of a deceased wrongdoer, and we are aware of no decision that a survival statute applies to such a case. The reasons why punitive damages may not be recovered against an estate are the same whether the remedy is sought at common law or under a statute. We think, therefore, that, had the legislature intended that our survival statute should apply to the recovery of treble damages under ORS 105.810, it would have expressed that intention. We hold that the court erred in submitting the question of treble damages to the jury.

In view of this holding, other assignments of error in the brief related to treble damages need not be considered.

A serious question is presented by an assignment of error directed to the court's sustaining of plaintiffs' objection to testimony of the witness Herbert W. Crook. Mr. Crook was called by defendant as an expert witness on the value of the timber involved. The timber was located in what is known as the China Creek area of Curry County. From 1940 until 1965 Crook was in the timber business in that county. He testified that he was familiar with timber values in Curry County and particularly in the China Creek area, in the summer and fall of 1964, when the trespass

occurred, that he was familiar generally with the quality of the logs coming down from the China Creek area, with timber values throughout the county and with timber prices, and that he had bought logs that came out of the China Creek area from the decedent, Samuel A. Agnew. Before the objection was finally ruled on the witness testified under cross-examination respecting his qualifications as follows:

"Q. Mr. Crook, every piece of timber especially in Curry County varies a great deal in quality, as a matter of fact, within almost a hundred feet, isn't that correct?

"A. Yes.

"Q. In other words, all of a pocket of timber that will be beautiful peelers and then you will come onto some scraggly wind-blown timber, isn't that correct?

"A. Well, I wouldn't say it would vary in a hundred feet.

"Q. No, but I am saying that actually unless you knew the actual piece of timber involved and were acquainted with it, you would hesitate to say what it was worth, wouldn't you?

"A. I think I have enough knowledge of that area that I could tell you what timber was worth.

"Q. Would you be willing to pay for it on that basis?

"A. No, I'm not buying timber, I'm out of the mill business."

The witness further testified on cross-examination that in 1964 the difference in price between "number one peelers" and "saw logs laid into the mill" was about $65, and the cross-examination proceeded:

"Q. So, you would be guessing as to anything unless you knew the particular timber involved that could be anywhere from peelers to number three saw logs, wouldn't you?

"A. Well, you just don't have one patch of timber all peelers here and a hundred feet away, as you say, all mill logs.

"Q. No, but you have a variance that you are going to have to guess between the difference of sixty-five dollars because you don't know this particular timber, do you?

"A. I am pretty well acquainted with it, I probably know a great deal more about it than you because I discussed it with Mr. Agnew before he died. He was thinking at that time of selling it.

"Q. When was that?

"A. It was about '63, if I remember right.

"Q. Well, this timber that we are involved in here wasn't owned by Mr. Agnew.

"A. I know it, I am talking about the general area timber.

"Q. Now, the point is, though, that unless you could see the particular timber involved because I think you testified that timber in this area particularly varies according to that which is in a pocket which is protected and gets lots of rain and moisture and that is protected from wind as against the timber which is on ridges and other places such as that?

"A. Well, your high ridges is poor timber, that is conceded by all timber men.

"Q. But, as you sit here today, would you be willing to buy any piece of timber up there on a per thousand-foot basis for so much without looking at it?

"A. Well, can I ask you the same question because you are not in the timber business and I am not in the timber business.

"THE COURT: You cannot ask him a question, simply answer the question if you can.

"A. No, I wouldn't.

"MR. HAVILAND: All right."

Mr. Crook further testified that if he were buying a small quantity of timber, perhaps 100,000 feet, which would not "average out," he would want first to cruise it "to see how much was there and the quality of it."

The question to which the court sustained objection was: "Do you have an opinion as to the value of stumpage in the China Creek area, the area of this trespass?" The ground of the objection was that "there isn't sufficient foundation based upon the information of the particular logs and trees involved and it is a question of log value * * *." The court ruled that the witness was not qualified "to testify as to the value of this particular area."

The ruling is defended here with the argument that Mr. Crook did not testify that he was familiar with the particular trees involved and that there is a great variance in timber quality throughout Curry County. Were that argument to receive judicial sanction, there might well be instances in which the subject matter of the lawsuit had disappeared and it would be impossible for the injured party to establish its value, as, indeed, this case illustrates. The only witness for the plaintiffs on value was Mr. Ashcraft. He acquired his interest in the claim of the plaintiffs by assignment after the trespass. He had never seen the timber. The decedent built a road through the timber and in that part of the area removed most of the stumps. Ashcraft was able to acquire some knowledge of the quality of the trees the stumps of which were left by examining them. He testified, however, not only to the value of those trees, but also to the value of the other trees which were removed, stumps and all. Had objection been made to the latter testimony, the court would have had to sustain it on the theory advanced to support the objection to Crook's testimony, and, so far as the record discloses,

plaintiffs had no witness who had seen the trees and was for that reason qualified to testify to the value of those removed in toto.

■ That Crook was a competent witness as to stumpage value in Curry County and particularly in the China Creek area, is not questioned. He had even bought logs that came out of that area from the decedent Agnew, some of whose timber adjoined that of the plaintiffs. Before he took the stand evidence of the quality of the trees involved had been received. He was a competent witness to testify to the market value of those trees or of the logs which they produced, upon being advised of their quality as shown by the evidence, regardless of the fact that he had never seen them. It is scarcely necessary to cite authority for this proposition. As the court said in *Haynes, Executrix v. Glenn,* 197 Va 746, 751, 91 SE2d 433, a case involving the value of stolen jewelry:

> "As has been said, Fall [a jewelry expert] had never seen the articles in question and testified as to their value from the description which Mrs. Glenn gave of them. This method of proving the value of articles which cannot be produced for inspection is frequently used. Such testimony was admissible, its weight being for the court as the trier of fact. 32 C.J.S., Evidence, § 545, pp. 282, 283."[9]

See, also, *Consylman et ux v. Garrett et al,* 164 Pa Super 618, 622, 67 A2d 641.

Plaintiffs say in their brief that the witness was not asked a hypothetical question. That is true, but defendant's counsel was cut off from asking such a question by plaintiffs' objection and the court's ruling.

Plaintiffs invoke the rule that determination of the

[9] The citation is to the former text of CJS. See, to the same effect, the 1964 revision of 32 CJS 429, 430, Evidence § 546.

qualifications of a witness to testify as an expert is committed largely to the discretion of the trial judge and that discretion will not be disturbed except for abuse, *Miller Const. Co. v. D. M. Drake Co.*, 221 Or 249, 258, 351 P2d 41, and Oregon cases there cited. But it is a *judicial* discretion of which the courts speak, to indicate that the decision must be one supportable under the evidence and by reason and the law. We think that the ruling here does not measure up to that standard and was reversible error.

There are other assignments of error, but as the questions may not arise on another trial we need not pass upon them.

The judgment is reversed and the cause remanded for further proceedings in conformity with this opinion.