No. 7 May 2, 2018 87

IN THE OREGON TAX COURT
REGULAR DIVISION

LEVEL 3 COMMUNICATIONS, INC.,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5236)

At trial, both Plaintiff and Defendant made several evidentiary objections as to admissibility of evidence and testimony regarding the value of Plaintiff's property at issue. The court ruled that Plaintiff's and Defendant's trial experts qualified as expert witnesses for purposes of assisting the court in determining the value of the property at issue in the consolidated cases. The court also ruled that certain of Plaintiff's trial exhibits and Defendant's trial exhibits were to be admitted; Defendant's Exhibits E and F were admitted for demonstrative purposes only. Further, the court ruled that Defendant's Exhibits M, O, P, and T, and any testimony pertaining to those exhibits were admitted for consideration as to tax year 2016-17, but were not to be considered for tax years 2014-15 and 2015-16. Lastly, that Defendant's Exhibits M, O, P, and T, and all testimony pertaining to those exhibits, and witness Robert Reilly's testimony on Plaintiff's offer of proof, were admitted for consideration as to tax year 2016-17, but were not to be considered with respect to tax years 2014-15 and 2015-16.

Submitted on Plaintiff's and Defendant's evidentiary objections at trial.

Cynthia M. Fraser, Garvey Schubert Barer, PC, Portland, stated the objections and argued the cause for Plaintiff (taxpayer).

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, stated the objections and argued the cause for Defendant Department of Revenue (the department).

Decision rendered May 2, 2018.

**ROBERT T. MANICKE, Judge.**

## I.  INTRODUCTION

This matter is before the court on evidentiary objections made during trial, on which the court reserved its ruling. In addition to hearing objections at trial, the court held

oral argument immediately following trial on the objections listed as (1)-(3) below.

## II.   SUMMARY OF OBJECTIONS

The objections before the court are as follows:

(1)   Defendant's objection to testimony, reports, and work papers of Plaintiff's witness Dr. Hal B. Heaton related to the valuation of Plaintiff's property.

(2)   Plaintiff's objection to testimony, reports, and work papers of Defendant's appraisal witness D. Brent Eyre related to the valuation of Plaintiff's property.

(3)   Plaintiff's objection to testimony and reports of Defendant's review appraisal witness Dr. Antonio Bernardo on the methods and assumptions used by Heaton.

(4)   Plaintiff's objection to introduction of testimony and exhibits relating to the transaction between CenturyLink, Inc. (CenturyLink) and Plaintiff occurring after the valuation dates in these consolidated cases.

(5)   Plaintiff's objection to reproduced portions of corporate finance textbooks discussed or relied on by Bernardo.

## III.   ANALYSIS

The first three objections generally concern whether witnesses of Plaintiff or Defendant qualify as expert witnesses for purposes of giving an opinion of the value of the property at issue, or discussing perceived errors in the opposing party's appraisal or valuation. Testimony by expert witnesses is provided for in Oregon Evidence Code (OEC) Rule 702:

> "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

OEC 702; ORS 40.410.[1] Of interest in this case is a portion of the commentary following the rule (the OEC 702 Commentary):[2]

---

[1] Unless otherwise indicated, the court's references to the Oregon Revised Statutes (ORS) are to 2017.

[2] The OEC 702 Commentary comes directly from commentary of the federal advisory committee concerning Federal Rule of Evidence (FRE) 702. It was

> "*The rule is broadly phrased*. The fields of knowledge which may be drawn upon are not limited merely to the 'scientific' and 'technical' but extend to all 'specialized' knowledge. Similarly the expert is viewed, not in a narrow sense, but as a person qualified by 'knowledge, skill, experience, training or education.' Thus within the scope of the rule are not only experts in the strictest sense of the word, e.g., physicians, physicists and architects, but also the large group sometimes called 'skilled' witnesses, *such as bankers or landowners testifying to land values.*"

OEC 702 Commentary (emphases added). The OEC 702 Commentary contemplates nonappraisers offering opinions as to the value of property and is consistent with prior Oregon case law.

In *Astoria Plywood Corp. v. Dept. of Rev.*, 258 Or 76, 86, 481 P2d 58 (1971) (affirming 4 OTR 122 (1970)), the Oregon Supreme Court considered an objection by the Department of Revenue (the department) "that plaintiff's witnesses were not 'qualified expert appraisers'; that their testimony did not go to the value of the entire plant, but was 'nit picking and unsubstantiated,' whereas [the department's] own witness was the only 'qualified expert' who used 'the authorized appraisal technique of replacement cost less depreciation.'" The Supreme Court rejected the department's argument, stating:

> "[P]laintiff's expert witness, Mr. Shull, was qualified by long experience, if not by 'technical training,' to testify on the subject of the market value of used plywood mill machinery and equipment, in accord with our decision in [*Portland Canning Co. v. Tax Com.*, 241 Or 109, 404 P2d 236 (1965)]."

*Id.* at 86-87. This court's prior decision provides additional insight to Mr. Shull's qualifications:

> "James Shull who testified for the plaintiff regarding the value of new and used mill equipment and machinery was particularly experienced in this field. He had purchased and sold many mills, constructed others, and had

---

"adopt[ed]" by the Oregon legislative assembly because, at the time OEC 702 was enacted in 1981, OEC 702 was "identical" to FRE 702. OEC 702 (1981 Conference Committee Commentary); 1981 Or Laws, ch 892, § 58.

years of experience in buying and selling mill machinery and equipment."

4 OTR at 123. Accordingly, Oregon has not historically limited the status of expert valuation witnesses to those having received any particular certification or other formal qualification or "technical training."

The precedent is not limited to the valuation context. For example, the Oregon Supreme Court has more recently held that a trial court erred by precluding the testimony of a witness on the possible causes of the defendant's frontal lobe dysfunction. *State v. Rogers*, 330 Or 282, 316, 4 P3d 1261 (2000). The court stated, "[a] medical degree is not a necessary predicate to finding an expert witness qualified to testify about medical knowledge, assuming that witness otherwise is qualified to do so." *Id.* After reviewing the witness's education, training, teaching experience, publication record and history of testifying in other cases, the court concluded that the witness had demonstrated his qualifications.[3]

The Oregon Court of Appeals, relying on *Rogers*, has stated, "[a] witness is not assumed to be disqualified merely because the person lacks a particular educational or professional degree." *State v. Hazlett*, 269 Or App 483, 494,

---

[3] The Supreme Court's opinion stated:

"The record demonstrates that Blakely *had special training and knowledge relating to, and thus was qualified to testify about*, the possible causes of frontal lobe dysfunction. Blakely testified that he holds a Ph.D. in physiological psychology, has done post-doctoral work in neuroscience, including neuropathology, and has taken advanced workshops including several at Harvard Medical School. He has taught neuroanatomy at the University of California, among other places, and has written a treatise on neuroanatomy. He has worked in the field of electroencephalography for more than 20 years, specializing in electroencephalographic measurement and interpretation, and also performs neuropsychological evaluation. He belongs to several professional organizations, including the International Neuropsychological Association. He has published several papers, including a monograph on the neuropsychological basis of crime, and articles in peer-reviewed journals. Members of his field routinely render interpretive conclusions, and Blakely has rendered opinions and conclusions based on his data in the past, including as part of civil and criminal proceedings. That *combination of education and experience* demonstrated that Blakely had the *requisite knowledge to testify helpfully* about the possible causes of defendant's frontal lobe dysfunction. The trial court erred in concluding otherwise."

*Id.* at 317 (emphases added).

345 P3d 482 (2015). Rather, the court assesses the "particular qualifications of the witness." *Id.* Stated differently, there is a "preference for examining the knowledge of each expert witness regarding the subject of his or her testimony, rather than adopting a rigid rule tied to a particular degree or specialty," or "professional license." *Trees v. Ordonez*, 354 Or 197, 211, 311 P3d 848 (2013).

Even when an appellate court ultimately has found a witness unqualified to give an opinion in a particular area, the court has done so after first examining the witness's individual qualifications. In *State Dept. of Trans. v. Montgomery Ward Dev.* (*Montgomery Ward*), 79 Or App 457, 465, 719 P2d 507 (1986), the Oregon Court of Appeals held that an expert real estate appraiser was *not* qualified to opine on whether land would probably be vacated because of the construction of Interstate 205. However, the court reached that conclusion only after considering the basis for the opinion of the witness and finding that basis deficient. The Court of Appeals explained:

> "The witness who gave the testimony, Curtis, was qualified only as an expert real estate appraiser. He was retained by the state to appraise the property taken by the state. There was no showing that he was qualified to give an opinion as to the probability of the vacation of a street. He stated that he based his opinion on a conversation with a traffic engineer for Multnomah County whose responsibility it is to give recommendations for vacations of streets. Curtis did not describe the topic of his conversations with this other person, nor did he state the facts on which he based his opinion. The opinion thus lacks a proper foundation. Moreover, the opinion is speculative because the decision to vacate rests with another county body and is independent of the I–205 project, and there is no evidence regarding the county's policy or procedures as to street vacations. For these reasons the trial court erred in admitting the evidence of that special benefit."

*Id.* at 465. Note that the Court of Appeals did not say that a real estate appraiser *cannot* offer an opinion of the probability of street vacation. Rather, the Court of Appeals analyzed the record before it and found an insufficient basis upon which to also determine that the witness was qualified to give an opinion on when land would be vacated. That

holding relied, in part, on the fact that the witness based his opinion on one conversation with a traffic engineer. *Id.*

In determining qualification of a witness as an expert, the court must look to the nature of the opinion expressed and the basis for that opinion.[4] With respect to the qualification of various witnesses as expert witnesses in this case, the nature of the opinions expressed all relate to the unit valuation of property subject to central assessment.

A.   *Testimony and Reports of Dr. Hal B. Heaton*

Dr. Hal B. Heaton testified in Plaintiff's case-in-chief as Plaintiff's primary valuation witness. He prepared reports, each entitled "Valuation Analysis," regarding Plaintiff's property for tax years 2014-15, 2015-16, and 2016-17. Plaintiff's Exhibit 21, which was admitted without objection, contains Heaton's resume.[5] Heaton is not licensed as an appraiser in any state. *See* ORS 674.100(1) (generally requiring licensure to engage in "real estate appraisal activity"), (2)(k) (creating exception for activity "limited to giving an opinion in an administrative or judicial proceeding regarding the value of real estate for taxation").

Heaton is employed by Brigham Young University as a professor of finance. He has undergraduate degrees in mathematics and computer science, a master's degree in business administration from Brigham Young University, a master's degree in economics from Stanford University, and a Ph.D. in finance from Stanford University. He spent two years as a visiting associate professor of finance at Harvard University.  Heaton specializes in corporate finance, which he testified includes valuation and capital markets.

Heaton has authored around three dozen articles on the valuation of corporate entities and property. Some of his published research papers bear titles directly related to valuation of property, including but not limited to: "Adjusting Securities Data to Value Real Property: The Size Premium

---

[4] The court expresses no view as to the weight it will assign to the testimony of any witness.

[5] The record citations in this order are to the transcript volumes as they stand after being submitted by the court reporter but before the period for corrections has lapsed.

as a Minimum Illiquidity Adjustment"; "Key Issues in Determining Discount Rates for Valuing Real Property"; "Determining Discount Rates for Valuing Properties in Distressed Industries"; "Adjusting the Cost Approach for Excess Operating Costs, Environmental Cleanup and Other Value Reductions"; "Using Mergers and Acquisitions Data in Property Tax Appraisals"; "Eliminating Significant Intangibles from Property Tax Appraisals";[6] and "Choosing the Weights in Appraisal Correlation."

Heaton has published this research in a number of valuation-related publications, including but not limited to: *The Journal of Property Tax Assessment and Administration* at least five times, *The Journal of Property Tax Management* at least a dozen times, *The Journal of Property Valuation and Taxation*, and *The Appraisal Journal*. He also has presented on valuation matters numerous times at conferences, including the annual Wichita State University Public Utilities Conference, which focuses on valuation issues for centrally assessed ad valorem tax purposes.

Heaton has testified "[m]any" times as an expert in valuation cases across the country. He has testified "[s]everal" times in cases involving the unitary valuation of telecommunications companies. Although this case is the first time Heaton has prepared an opinion of value for court use, he has prepared "[s]everal" outside the courtroom for ad valorem property tax purposes.

Defendant objected to the admission of Heaton's valuation analyses and related work papers, and to his testimony at trial, on the grounds that Heaton is not qualified to serve as an expert. In its initial objection during trial, Defendant noted Heaton's lack of licensure as an appraiser and his experience in business valuation as opposed to property valuation. During oral argument, Defendant also: (1) claimed that the fact that Heaton was not an appraiser prevented him from rendering an independent opinion,

---

[6] One of the key issues in this case is the extent to which Defendant's appraiser included "intangibles" arguably not subject to assessment and taxation, or the extent to which Plaintiff's appraiser failed to include "intangible property" subject to assessment and taxation. By reference to this article, the court does not imply a predetermination of that or any other substantive issue.

as evidenced by the unit of property he valued for the 2014-15 tax year; (2) cited Heaton's lack of awareness "that the statutes do not require a separate appraisal of assets"; and (3) argued that business valuation is a separate subject from property valuation, citing *Montgomery Ward*.

Notwithstanding his lack of licensure as an appraiser, the court finds Heaton qualified to testify and submit a report on the valuation of the property at issue in this case based on his "knowledge, skill, experience, training [and] education," as evidenced by his written resume detailing his three graduate degrees in business, economics and finance, his work as a professor of finance, and his lengthy list of publications and presentations on valuation topics, many of which relate directly to valuation for property tax purposes. OEC 702. The OEC 702 Commentary specifically contemplates expert testimony on property valuation by nonappraisers, including unlicensed persons "such as bankers or landowners." OEC 702 (1981 Conference Committee Commentary). The Oregon Supreme Court has squarely rejected a "technical training" requirement to value property subject to assessment and taxation. *Astoria Plywood Corp.*, 258 Or at 86. Heaton has amply demonstrated his knowledge regarding valuation of income-producing properties. *See Trees*, 354 Or at 211.

Defendant's specific arguments stem from the parties' differing positions on the underlying legal concepts at issue in this case. Heaton followed instructions from Plaintiff's counsel to value the same unit that Defendant had used in its assessment for each of the three tax years at issue. The parties are at odds over selection of the correct unit, and the instructions to Heaton clearly reflect Plaintiff's legal position in that dispute,[7] not a failure of qualification of Heaton.

---

[7] As noted in the court's Order Denying Defendant's Second Motion in Limine, the parties could have asked the court to determine the legal issues in this case before the parties' respective valuation analyses were concluded. *Level 3 Communications, Inc. v. Dept. of Rev.*, TC No 5236 (Apr 3, 2018) (slip op at 3-4); *See also Norpac Foods, Inc. v. Dept. of Rev.*, 18 OTR 41, 43 (2004) (Preliminary Ruling) (making preliminary legal ruling because "[a]ppraisers must consider the law applicable to the location of the property being appraised" and because "it would be inappropriate to leave appraisers in doubt as to the governing law they must consider when providing assistance to the court"). The parties, however, opted to continue with trial in full awareness of the outstanding legal issues.

Similarly, Defendant argued that Heaton's lack of awareness "that the statutes do not require a separate appraisal of assets" demonstrates his lack of qualification as a valuation expert. The court understands this argument to go to Heaton's exclusion of value that Defendant argues is includible in the unit of "property," but that Plaintiff argues is either (1) inherent solely in Level 3 Communications, Inc. (L3CI)[8] as a "going concern" (but not in the real property, tangible personal property, or identifiable intangible property it owned or used as of the assessment date) or (2) is attributable to intangible assets that Plaintiff asserts are not "property" (such as goodwill recorded on the balance sheet of L3CI). Heaton's analysis in conformity with a party's position on a contested legal issue does not disqualify him as an expert. *Cf. Seneca Sustainable Energy, LLC III v. Dept. of Rev.*, 23 OTR 22, 31 (2018) (finding appraiser's valuation of intangible property in local assessment case objectively unreasonable, where statute specifically prohibited taxation of intangible property not used in a centrally assessed business).

Finally, Defendant argues that Heaton may be qualified to give an opinion on the value of a business, but that he is not qualified to give an opinion on the value of property. In support, Defendant relies on *Montgomery Ward* for the proposition that a witness qualified as an expert in one area is not qualified as an expert in an unrelated area. 79 Or App at 466. Defendant's reliance on *Montgomery Ward* is misplaced. There, the Court of Appeals excluded the testimony because—in contrast to Heaton—the purported expert did not demonstrate a sufficient basis on which he could be qualified in both areas. Moreover, in this case Defendant's own expert used business valuation techniques to determine a proxy for property value when conducting his stock and debt analysis, demonstrating that the two subjects are not unrelated. Heaton accordingly is qualified to give an opinion of value of Plaintiff's property.

The court admits the testimony of Heaton, as well as his valuation analyses reports and work papers contained in Plaintiff's Exhibits 1-4.

---

[8] During the years at issue, L3CI was a publicly traded corporation that owned all of the membership interests in Plaintiff. (Trans Vol 3 at 16-17.)

B.   *Testimony and Reports of D. Brent Eyre*

D. Brent Eyre testified as Defendant's primary valuation witness. During oral argument on these evidentiary objections, Plaintiff's counsel admitted that Eyre is qualified to offer an expert opinion of value to the court, and in any event the court finds Eyre qualified based on his experience overseeing the taxation of centrally assessed companies on behalf of the state of Utah, his education, and his extensive list of presentations given and appraisal courses taught. Plaintiff's argument focused instead on whether Eyre, who is licensed as an appraiser under the laws of Utah, "complied with the technical rules that apply to licensed appraisal" in Oregon. Defendant argued that Eyre did comply with the rules applicable to licensed appraisers.

The court need not rule on this technical aspect of the law. First, the question of Eyre's compliance with appraisal license requirements almost undoubtedly falls outside the jurisdiction of the Tax Court. Second, even if Eyre has failed to comply with licensing requirements, Plaintiff has not demonstrated how that fact would make his opinion of value in this case any less helpful to the court. The court admits the testimony of Eyre, as well as his appraisal reports and work papers contained in Defendant's Exhibits A-D.

C.   *Testimony and Reports of Dr. Antonio Bernardo*

Dr. Antonio Bernardo was Defendant's review valuation witness. His testimony was offered to demonstrate what he perceived to be erroneous conclusions or methods in Plaintiff's valuation reports. During oral argument, Plaintiff's counsel admitted that Bernardo is qualified to test the valuation reports of Plaintiff's witness Heaton. The court independently finds that Bernardo is so qualified and admits his testimony and his reports contained in Defendant's Exhibit V.[9]

---

[9] Bernardo is a professor of finance at the UCLA Anderson School of Management. He has a Ph.D. in Economics from Stanford University. He has written extensively on financial matters, which qualifies him to test the methods and judgments of Dr. Hal B. Heaton's income approach to value.

## D.   *Documents Related to CenturyLink Transaction*

Defendant offered Exhibits M, O, P, and T, which relate to or describe a transaction that closed in late 2017 between L3CI and CenturyLink (the CenturyLink Transaction). Defendant's Exhibit M is a news article dated October 31, 2016, appearing in *Business Insider.* Defendant's Exhibit O is nine pages of excerpts from CenturyLink's quarterly report (Form 10-Q) filed with the Securities and Exchange Commission (SEC) for the period ending September 30, 2017. Defendant's Exhibit P is three pages of excerpts from the Form 10-Q of Level 3 Parent, LLC (f/k/a Level 3 Communications, Inc.) for the quarterly period ending September 30, 2017. Defendant's Exhibit T is an apparently complete annual report (10-K) of L3CI filed with the SEC for the period ending December 31, 2016, (the December 31, 2016, L3CI 10-K). Defendant's appraisal expert Eyre testified that, in his view, the CenturyLink Transaction corroborated certain trends identified in his appraisal, but that he did not rely on the CenturyLink Transaction to establish value for any tax year because the information of the transaction would not have been available.[10]

Plaintiff objected to the admission of Defendant's Exhibits M, O, P, and T, and to testimony of Eyre regarding the CenturyLink Transaction, arguing that the documents and testimony lack relevance for three reasons.[11]

---

[10] Eyre's testimony about the CenturyLink Transaction consists of his responses to questions upon direct examination by Defendant over the course of approximately five minutes, and his responses to questions on cross-examination. He testified that he did not consider the transaction when preparing his appraisal report on the value of Plaintiff's property for any of the tax years at issue because "the information was not available on the [lien] dates that I was asked to appraise the property for." However, he stated that he believed the transaction "corroborated the trends that [he] observed" in preparing his appraisals as of January 1, 2014, 2015, and 2016.

[11] The transcript shows Plaintiff's counsel commenting on Defendant's Exhibits O and T, two separate SEC forms, being "also a hearsay problem." However, the audio recording differs. Plaintiff's counsel actually stated, "For the party admissions it solves the hearsay problem but the party admission still has to be an admission." The audio and the transcript then again track to show that Plaintiff's counsel was actually continuing its relevance argument. (Plaintiff's counsel stated that the CenturyLink Transaction "has no bearing, in our view, on the issues before the Court; therefore documents that post-date the last date of value have no relevance there.") There is no record of Plaintiff actually making a hearsay objection.

Plaintiff first argued that information pertaining to the CenturyLink Transaction was not knowable to a diligent buyer on any of the assessment dates, stating that "the first discussion about a transaction took place in June of 2016, according to the proxy statement."[12] In addition, consistent with Plaintiff's position that the value of the property at issue in this case is distinguishable from the value of L3CI as a company, Plaintiff argued or offered testimony that the CenturyLink Transaction is inapposite to a sale of the property at issue in this case because (1) CenturyLink acquired all of the stock of L3CI (via a merger), (Plaintiff's counsel stated, "It was a merger. It's not a sale of assets."), and (2) although CenturyLink and L3CI agreed to undertake the transaction in October 2016 (approximately one year before they expected to close the transaction), the process of allocating the merger consideration among various classes of assets for federal income tax purposes is still not complete and is not required to be finished until later in 2018.[13] (Plaintiff's counsel stated that the "reported purchase price, however, has since been adjusted down by over $4 billion.")[14]

### 1. *Applicable Law*

The leading authorities on the relevance of a later transaction as evidence of value on an earlier assessment date include *Sabin v. Dept. of Rev.*, 270 Or 422, 528 P2d 69 (1974), and *Oakmont, LLC v. Dept. of Rev.*, 359 Or 779, 377 P3d 523 (2016), which interprets *Sabin*. In *Sabin*, the court stated:

> "A sale of the property within a reasonable time of the assessment while not conclusive, is very persuasive of market value. Whether a transaction is so recent as to be persuasive of present value will *depend upon the similarity of*

---

[12] The referenced proxy statement is not in the record; in the proffered one of December 31, 2016, L3CI states that CenturyLink and L3CI entered into a merger agreement on October 31, 2016, to be consummated November 1, 2017, and that the last stock trading day before public reports of a possible transaction was October 26, 2016.

[13] *See* IRC § 1060 (requiring allocation); Treas Reg § 1.10601 (prescribing asset classes).

[14] The testimony of Robert Reilly was proffered as part of an offer of proof by Plaintiff to rebut Defendant's proffered exhibits concerning the CenturyLink Transaction.

*conditions affecting value* at the time of the transaction and conditions affecting value at the time of the assessment. The interval between the transaction in the subject property sought to be introduced and the assessment date may be so great that it can be said as a matter of law that there was a change in conditions. However, where this determination cannot be made as a matter of law, reference must be made to the underlying conditions affecting value before such evidence can be rejected. These principles apply equally to transactions in the assessed property before and after the valuation date."

*Sabin*, 270 Or at 426-27 (emphasis added; footnotes omitted). The court reads *Sabin* to stand for the proposition that the sale of a property before or after the assessment date is relevant to the value of the property on the assessment date, *if* there is evidence that the "conditions affecting value" are similar as a matter of law or fact. *Sabin*, 270 Or at 426-28*; see Oakmont*, 359 Or at 794 (clarifying that a later transaction is relevant if the information on which the later buyer and seller relied in setting the price of the subsequent sale was reasonably discoverable as of the assessment date). That proposition also applies to properties other than the one being valued. *See Truitt Bros., Inc. v. Dept. of Rev.*, 302 Or 603, 732 P2d 497 (1987) (holding consideration of similar property 15 months after assessment date is proper).

In light of this reading, Plaintiff's objection that the fact of the CenturyLink Transaction was not reasonably "knowable" to a potential buyer misses the mark. It is not the fact of the later transaction that must be knowable in order for the evidence of the transaction to be admissible. Rather, the Supreme Court's test requires analysis of whether the condition of the property and the market conditions between the assessment date and the date of the transaction were sufficiently stable that the court can reasonably infer that a willing buyer on the assessment date would have reached a conclusion of value similar to that of the party to the later transaction. *See Sabin*, 270 Or at 426-27; *see also Kem v. Dept. of Rev.*, 267 Or 111, 114 & n 2, 514 P2d 1335 (1973) (quoting 4 *Nichols on Eminent Domain*, 12-115, 12-116, § 12.311(1)) (noting eminent domain rule that recent sale of property is relevant to value assuming "'that no change in conditions or market fluctuation in values has occurred

since the sale'"); *Fidelity Sec. Corp. v. Brugman, et al.*, 137 Or 38, 48, 1 P2d 131 (1931) (stating that "defendants did not claim that the two-year period was accompanied with a decline in the market value or a change in the character of the property").

In *Sabin*, the parties agreed that the highest and best use of the property was as raw land suitable for retail development and that the existing improvements contributed relatively little to the property's overall value. 270 Or at 425. Accordingly, the court focused on market conditions rather than on the condition of the property itself. The Supreme Court agreed with this court in rejecting the admission of evidence of an *earlier* purchase of the same property, finding "conclusive" evidence of "fundamental change in the use of the land in the area" giving rise to dramatic price rises during the interval between that purchase and the assessment date. *Id.* at 427. However, the Supreme Court reversed this court's refusal to admit proffered evidence of a *later* sale of the same property, directing this court to consider upon remand that the use of the land in the area apparently had ceased to change as of the assessment date and that there was no evidence in the record of a subsequent depression in land prices or other substantial difference in conditions affecting market value. *Id.* at 428-29.[15]

2. *Analysis*

The relevance of the CenturyLink Transaction exhibits thus depends on whether the conditions affecting the value of the property in these consolidated cases were sufficiently similar between any of the assessment dates and the date of the CenturyLink Transaction. As stated, that determination can be one of law or fact. Assuming for purposes of this order that the latter date was November 1, 2017, as anticipated in the December 31, 2016, L3CI 10-K, the court concludes that the interval of between 22 months and 46 months after the assessment dates in these consolidated cases is not, as a matter of law, fatal to its admission

---

[15] The subsequent record in this court indicates that the parties reached a resolution before the court could hear the case on remand. *Sabin v. Dept. of Rev.*, TC 721 (1975) (Order of Dismissal) (case file is available at Oregon State Archives).

and consideration by the court. *See Douglas County v. Myers, et al.*, 201 Or 59, 64-65, 268 P2d 625 (1954) (holding admission of evidence of value five years before valuation date was not prejudicial error); *Highway Commission v. Blaue et al.*, 231 Or 216, 217-18, 371 P2d 972 (1962) (holding admission of comparable sales evidence four years before valuation date was not error); *cf. Oregon R. & N. Co. v. Eastlack*, 54 Or 196, 205, 102 P 1011 (1909) (rejecting evidence of value 12 to 15 years removed from the valuation date). Turning to whether the CenturyLink Transaction documents are relevant as a matter of fact, the court considers each year separately as to the condition of the property and of the market.

For tax year 2014-15, the record in these consolidated cases includes not only facts for the period *preceding* the assessment date of January 1, 2014 (as is typical in any valuation case), but also facts admitted into evidence for the *next two calendar years* 2015 and 2016. Defendant's motion to admit evidence about the 2017 CenturyLink Transaction requires the court to consider the 2015 and 2016 evidence in order to apply the test in *Sabin*. The court concludes, without any need to examine the proffered CenturyLink Transaction evidence, that the character of the property and the market changed so significantly during the first two years after the assessment date as to render any evidence of value from the CenturyLink Transaction (corroborative or otherwise) meaningless as to tax year 2014-15.

As to the character of the property, the court makes two observations.[16] First, in October 2014, Plaintiff merged with tw telecom inc. for consideration of approximately $8.1 billion. For comparison purposes, Defendant's appraisal expert Eyre estimated Plaintiff's entire system value 10 months before that acquisition at $12.15 billion dollars. The court easily concludes that that transaction alone materially changed the character of Plaintiff's property that eventually was subject to the CenturyLink Transaction. Second,

---

[16] The court refers to the "character" of Plaintiff's property as a way to describe the relative size or amount of property owned or used by Plaintiff as of each assessment date. The court does not imply that the way property was used changed such that it could no longer be characterized as property owned or used in the communications business of Plaintiff. *See* ORS 308.515(1)(h) (providing for central assessment of property used in communications businesses).

Defendant's expert acknowledged in his 2015 appraisal that "intense change" in the telecommunications industry and growth in the usage of telecommunications services required the expenditure of "vast sums to upgrade [company] networks."[17] Defendant's opinions of value,[18] together with uncontested evidence by Plaintiff, demonstrate that Plaintiff *did* grow, at least between January 1, 2014, and January 1, 2016, in ways that required the integration of large amounts of new property into the network that would have existed by the time of the CenturyLink Transaction. Based on these observations, the character of the property as of January 1, 2014, was not similar to the character of the property at least as of January 1, 2016, let alone to the property as of November 1, 2017.

As to market conditions, the evidence is clear that the telecommunications market was experiencing significant change that would render the CenturyLink Transaction as of November 1, 2017, meaningless as a comparator to the value of Plaintiff's property on January 1, 2014. Defendant's expert, Eyre, recorded in his 2015 appraisal that there is "intense change" in the telecommunications industry, including growth in the usage of telecommunications services, but that "growth is coming at a cost" in the form of "spending vast sums to upgrade [company] networks." In his 2016 appraisal Eyre recorded that "[t]he only constant in the communications industry is change." This observation is consistent with testimony from Plaintiff's expert Heaton that telecommunications "costs are declining," prices "are driven down in the intense competitive nature of th[e] industry," and the "technology is evolving all the time." These factors create an environment in which Plaintiff and other current telecommunications carriers may face competition from

---

[17] Plaintiff's evidence supported the same conclusion, namely that there was a need, as of each assessment date, for "major capital expenditures to accommodate rising connectivity demands." Plaintiff maintained its network to a "right-size," with limited "headroom," and therefore generally required capital expenditures to service new customers.

[18] The court does not here refer to Plaintiff's opinions of value because Plaintiff valued a limited unit of property as of January 1, 2014, but a worldwide unit of property as of January 1, 2015, and January 1, 2016. This makes the comparison between the years less meaningful for the purpose of testing whether there was relative growth.

"new entrants to the communications industry, such as content companies that \*\*\* unlike the traditional incumbent carriers we also compete with, would not be burdened by an installed base of outmoded or legacy equipment." Based on these observations, the court concludes that the market as of January 1, 2014, had already materially changed by January 1, 2016.

With respect to tax year 2015-16, the evidence also supports a conclusion that the character of the property and market conditions substantially changed between January 1, 2015, and January 1, 2016. As to the character of the property, Plaintiff again grew from 2015 to 2016, with no record of that growth being attributable to mergers or other acquisition transactions. That growth required the integration of new property into the network that later became the subject of the CenturyLink Transaction. While in some ways this is a closer question than as to January 1, 2014, because there is no record of a merger affecting Plaintiff's growth, the court concludes that there is ample evidence that the character of the property changed materially between January 1, 2015, and January 1, 2016.

The market in which Plaintiff and its property operated also continued to experience significant change. In its December 31, 2015, 10-K, L3CI described the communications industry as remaining "highly competitive." Because of the inherent economies of scale in the industry, L3CI "believe[d] further consolidation may occur." The report also provides that "[t]he communications industry is subject to rapid and significant changes in technology." L3CI believed that advances in optical and Internet Protocol technologies "have facilitated, and will continue to facilitate, decreases in unit costs for communications service providers." L3CI also believed that prices would decrease. On this evidence, the court concludes that there was a substantial change in the market between the assessment date of January 1, 2015, and December 31, 2015.

With respect to tax year 2016-17, the record of admitted evidence generally stops at the assessment date of January 1, 2016. The best sources of information available to the court about any changes to the property or changes

in market conditions after that assessment date are Defendant's proffered exhibits, particularly the December 31, 2016, L3CI 10-K and the September 30, 2017, Form 10-Q of Level 3 Parent, LLC.

As to the character of the property at issue in this case, those documents do not indicate any significant mergers into Plaintiff or L3CI comparable to the tw telecom inc. transaction. Without supporting testimony, however, they also do not provide a level of detail sufficient for the court to assess whether Plaintiff continued to add large amounts of property to its network or whether the market in which Plaintiff and its property operated continued to experience substantial change. There are numerous predictions as of January 1, 2016, indicating that those trends would likely continue, including Eyre's summation as of January 1, 2016, that "[t]he only constant in the communications industry is change. Numerous deals and agreements have been reached over the past year, and Value Line expects this trend to continue."

However, the court will not attempt to glean from the raw data in Defendant's Exhibits T and P a conclusion about whether those trends actually continued. The court admits Defendant's Exhibits M, O, P, and T and the parties may argue the weight, if any, that the court should assign to information in those exhibits. Accordingly, the court also admits under Plaintiff's offer of proof on the last day of trial, the testimony from Robert Reilly describing the CenturyLink Transaction. However, the court will not consider any evidence of the CenturyLink Transaction with respect to TC 5236 (tax year 2014-15) or TC 5269 (2015-16).[19]

Plaintiff's remaining bases for asserting lack of relevance—distinguishing the CenturyLink Transaction as a merger rather than an asset sale, and the as-yet incomplete allocation of purchase price among different classes of assets—are inextricably tied to the parties' differences in their legal theories about the nature of the property being

---

[19] Defendant's offer of proof regarding the same exhibits is noted for the record. (Trans Vol 6 at 183.)

valued, and the parties have left those differences for the court to resolve as part of its decision on trial, following post-trial briefing. The court overrules Plaintiff's objections on those remaining grounds.

E.  *Articles Pertaining to Corporate Finance*

Defendant offered Exhibits E and F, which contain reproduced portions of corporate finance textbooks. Plaintiff objected to the admission of these exhibits on hearsay grounds, unless they would only be introduced for demonstrative purposes. (Plaintiff's counsel stated, "If we allow them for demonstrative purposes, I am fine. The Court can peruse them if it wants.") Both exhibits contain excerpts from the two corporate finance textbooks that were either cited or quoted by Defendant's witness Bernardo in his review valuation reports.

The court understands Plaintiff's limited objection to these exhibits—that they would be admissible only for demonstrative purposes—to mean that Plaintiff objects to their introduction as a substantive basis on which the court can determine the valuation issues in this case, as opposed to their introduction to demonstrate what Bernardo relied on in formulating his opinions as an expert. That objection is well taken. Defendant's Exhibits E and F are admitted, but only to assist the court in understanding the testimony of the respective experts in these consolidated cases.

## IV.   CONCLUSION

Dr. Hal B. Heaton, D. Brent Eyre, and Dr. Antonio Bernardo are qualified as expert witnesses for purposes of assisting the court in determining the value of the property at issue in these consolidated cases. Plaintiff's Exhibits 1, 2, 3, and 4 are admitted. Defendant's Exhibits A, B, C, D, and V are admitted. Defendant's Exhibits E and F are admitted for demonstrative purposes only. Defendant's Exhibits M, O, P, and T, and any testimony pertaining to those exhibits, are admitted for consideration as to tax year 2016-17, but will not be considered with respect to tax years 2014-15 and 2015-16. Now, therefore,

IT IS ORDERED that Dr. Hal B. Heaton, D. Brent Eyre, and Dr. Antonio Bernardo are qualified as expert

witnesses for purposes of valuing Plaintiff's property, and their testimony is admitted.

IT IS FURTHER ORDERED that Plaintiff's Exhibits 1, 2, 3, 4, and Defendant's Exhibits A, B, C, D, and V are admitted; Defendant's Exhibits E and F are admitted for demonstrative purposes only.

IT IS FURTHER ORDERED that Defendant's Exhibits M, O, P, and T, all testimony pertaining to those exhibits, and Robert Reilly's testimony on Plaintiff's offer of proof, are admitted for consideration as to tax year 2016-17, but will not be considered with respect to tax years 2014-15 and 2015-16.